UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                              :
GIUSEPPE GUGLIELMI,                           :
                                              :
                          Plaintiff,          :
                                              :        06 Civ. 3431 (GEL)
         -against-                            :
                                              :        **OPINION AND ORDER**
NORTHWESTERN MUTUAL LIFE                      :
INSURANCE COMPANY,                            :
                                              :
                          Defendant.          :
                                              :
-------------------------------------------------------------x

Mitchell Flachner, Hankin, Handwerker & Mazel,
PLLC, New York, New York, for Plaintiff.

Mee Sun Choi, McElroy, Deutsch, Mulvaney &
Carpenter, LLP, New York, New York, for
Defendant.


GERARD E. LYNCH, District Judge:

         In this action governed by the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001, et seq., plaintiff Giuseppe Guglielmi challenges the denial of his

claim for disability benefits under an insurance plan funded and administered by defendant,

Northwestern Mutual Life Insurance Company ("Northwestern Mutual").  Defendant moves for

a "judgment on the administrative record" or, in the alternative, for summary judgment, arguing

that the denial is supported by substantial evidence in the administrative record and is therefore

reasonable, and that plaintiff's claim was thus not wrongly denied.  For the reasons stated below,

summary judgment shall be granted to defendant.

**BACKGROUND**

Plaintiff was a co-owner of a restaurant business that purchased a group disability insurance policy from defendant for the benefit of qualifying employees or proprietors.  The group benefits plan ("Plan"), which defendant both funded and administered, became effective on March 27, 2002.

In September 2003, plaintiff submitted a statement to Northwestern Mutual to claim benefits under the Plan.  His employer and attending physician each furnished statements in relation to plaintiff's claim.  Also in relation to the claim, defendant received medical records indicating that plaintiff had been hospitalized for over a week in early January 2002 due to at least one stroke, which occurred in December 2001.  A month after he submitted his claim under the Plan, plaintiff also filed a claim under a disability insurance policy he had purchased from defendant as an individual.  The substance of these documents will be described as necessary during discussion of the legal issues.

By a letter dated October 2, 2003, defendant rejected plaintiff's claim under the Plan. The letter stated, among other information, that "it appears that you are claiming disability" as of July 1, 2002, "due to the limitations and restrictions imposed by your stroke and related conditions," and explained that, because the submitted information showed plaintiff to have been treated for problems stemming from his 2001 stroke within a certain prohibited period, the disability was a preexisting condition excluded from coverage.  (P. Ex. A.)  It is not disputed that the disability for which plaintiff was attempting to obtain benefits stemmed from problems associated with his December 2001/January 2002 stroke and complications.  Terms imposing a preexisting condition exclusion existed in the Plan as issued to plaintiff.

2

Guglielmi wrote later the same month to appeal the claim rejection.  He protested defendant's determination of his disability date as July 1, 2002, writing that "[a]lthough my strokes and subsequent impairment occurred in January of 2002 I did return to work in July of 2002 but have been experiencing a gradual decline beginning in July of 2003 up to today."  (P. Ex. H.)  He sought a review of his claim, "keeping in mind the July 2003 date," and offered to provide, without actually providing, "additional information that would help in your decision process including physician's comments, statements from my physical therapists or any other inform[ation] you may require."  (Id.)

On October 24, 2003, defendant affirmed its denial of liability on plaintiff's claim based on the preexisting condition exclusion but also cited a new, alternative reason: "[Y]ou never met the Actively At [W]ork requirement, and thus, you were never an insured Member."  (P. Ex. B.)  The Plan as issued set forth various eligibility requirements including, as will be further described, qualification by performing a certain level of work for a certain time.  The second rejection recited information that plaintiff had disclosed in his claim form submitted to Northwestern Mutual under his individual insurance policy:

> In . . . the attached "request for disability benefits" you filed with
> our Milwaukee office, you checked the box[,] "I performed some
> job duties and/or worked only part time and am claiming Partially
> Disabled Benefits during the following period(s):
> From 7/1/2002 To 12/31/2002       70% of time at all duties
> From 1/1/2003 To 6/30/2003        50% of time at all duties
> From 7/1/2003 To Present          30% of time at all duties."

(Id.)  Alongside this list describing the decline of his ability to work over time, however, plaintiff had consistently written "40+" or "40" as his "hours worked per week" during each period.  (P. Ex. G.)  Referencing plaintiff's individual-policy claim form, and apparently to explain its

rejection on the basis of the preexisting condition exclusion under the Plan, the letter stated among other conclusions that, "regardless of when we assume you became an insured 'Member,' your ability to work always fell within the definition of partial disability." (Id.)

Following the second rejection of his claim, plaintiff hired a lawyer, Bruno Gioffre, who demanded and received the entire extant record regarding the claim. Gioffre subsequently wrote, on September 13, 2004, to request another review of plaintiff's claim. (P. Ex. I.) His letter did not address either of defendant's stated bases for denial – the preexisting condition exclusion or ineligibility for lack of sufficient work – but rather raised an issue unrelated to the claim's actual viability under the Plan terms. He contended that plaintiff had been "misled" by a Northwestern Mutual representative – apparently at the start, when plaintiff had first begun paying premiums on the policy – "as to the nature and effectiveness of coverage offered him" and thus had been falsely induced to forgo other insurance options, presumably in the expectation that he could count on coverage under the Plan. (Id.)

Defendant responded on September 20, 2004, reiterating the two prior cited bases for rejection under the terms of the Plan. Administrator Laurens Dronkers's letter elaborated, "[W]e received a telephone call from Mr. Guglielmi on July 15, 2004, during which he informed me that he never returned to work for more than 30 hours per week after July, 2002. Therefore, Mr. Gug[]lielmi was never considered a Member under the provisions of the group policy . . . . [He] work[ed] less than the required amount of hours to be considered a Member." (P. Ex. J.) Dronkers added that, after investigating plaintiff's accusation of having been misled by a Northwestern Mutual agent, "we do not find any reference or support that a false or misleading representation was made." (Id.)

4

It does not appear that plaintiff sought a further review by defendant.  In March 2006, he filed a complaint in state court alleging that defendant was improperly denying him disability benefits amounting to $6000 per month beginning July 1, 2003.  Defendant successfully removed the action to federal court, on the ground that plaintiff's claims were covered by ERISA.

## DISCUSSION

I.    Legal Standards

   A.    Form of Decision

Defendant seeks either a "judgment on the administrative record" or summary judgment. The Second Circuit has noted that the mechanism of a "motion for judgment on the administrative record . . . does not appear to be authorized in the Federal Rules of Civil Procedure," although such motions "are frequently made by insurers in ERISA benefits cases." Muller v. First Unum Life Ins. Co., 341 F.3d 119, 124 (2d Cir. 2003).  These motions are properly treated either as motions for summary judgment or – if made at a stage after issues of fact have been found to remain, and if those issues properly may be resolved by the district court – as motions requiring a court in deciding them to set forth findings of fact and conclusions of law pursuant to Rule 52(a).  See id.  Substantively, this understanding of requests for decision as brought by defendants in ERISA-benefits cases does not differ from the understanding of such requests as brought by any litigant.

 The non-Rules-authorized label, "motion for judgment on the administrative record," seems, at least in this ERISA case, to serve as an unnecessary rhetorical device of the defendant to urge that the Court defer to the claim determination as made, on the then-available evidence,

below.  But any such deference properly depends on the circumstances of the case, not on the

wording of a particular request for decision; to this extent, defendant confuses the potential issue

of decisional standard with the nonissue of decisional form.  Thus, the Court treats defendant's

motion as a request for summary judgment.[1]

B.      Summary Judgment

Summary judgment shall be granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56(c).  A "genuine issue of material fact" exists if the evidence is such

that a reasonable jury could find in favor of the non-moving party.  Holtz v. Rockefeller & Co.,

258 F.3d 62, 69 (2d Cir. 2001).  The moving party bears the burden of establishing the absence

of any genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256

(1986).  In deciding a summary judgment motion, the court must "resolve all ambiguities and

draw all reasonable references in the light most favorable to the party opposing the motion."

Cifarelli v. Vill. Of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).  The nonmoving party, however,

may not rely on "conclusory allegations or unsubstantiated speculation," Scotto v. Almenas, 143

---

[1] Defendant makes no substantive argument for considering its motion under Rule 12(c), merely mentioning this course in its wish to obtain "expedited" relief.  (D. Mem. at 13.)  There is no reason under the circumstances why its request, treated as a summary judgment motion, should not result in an equally expeditious disposition.  Moreover, the decision it cites as "acknowledg[ing]" the "efficacy of Rule 12(c) motions in ERISA matters" (id.), actually does no such thing.  Rather, that decision addresses the *summary judgment* standard as "shaped through the application of the substantive law of ERISA," deeming a summary judgment motion in particular types of ERISA cases to be "properly considered as one *akin to* a motion under Rule 12(c) for judgment on the basis of the pleadings and the transcript of the record before the [administrator]."  Rizk v. Long Term Disability Plan of the Dun & Bradstreet Corp., 862 F. Supp. 783, 791 (E.D.N.Y. Aug. 8, 1994) (emphasis added).

F.3d 105, 114 (2d Cir. 1998), and "must do more than simply show that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., Ltd.,  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

In this case, to win summary judgment, defendant must show that there is no genuine issue of material fact as to the reasonableness of its denial of plaintiff's claim for benefits.  That a court in certain circumstances should defer to the decision of a plan administrator in assessing an ERISA case for such an issue, does not erase the need to determine the non-existence of a genuine issue before judgment may be granted defendant; it merely informs the level of scrutiny that may be exercised in making this determination.

C.    Claims of Wrongful Denial of Benefits under ERISA

When an ERISA benefits plan grants a plan administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," judicial review of the adequacy of a claim decision is limited to determining whether the decision was "arbitrary and capricious" or "an abuse of discretion."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  Under this "highly deferential" standard of review, an administrator's decision should only be disturbed if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law," Celardo v. GNY Automobile Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003), considering the "relevant factors" of the decision, Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995).  Substantial evidence consists of "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance."  Id. (brackets in original), citing Miller, 72 F.3d at 1072.  An administrator's decision under this

deferential standard may be upheld even when "there is evidence in the record . . . that would

have supported a contrary finding." Pulvers v. First UNUM Life Ins. Co., 210 F.3d 89, 94 (2d

Cir. 2000).

A "district court's review under the arbitrary and capricious standard is limited to the

administrative record." Miller, 72 F.3d at 1071.[2]  In light of the courts' limited power of review,

"if upon review a district court concludes that the [administrator's] decision was arbitrary and

capricious, it must remand to the [administrator] with instructions to consider additional

evidence unless no new evidence could produce a reasonable conclusion permitting denial of the

claim or remand would otherwise be a 'useless formality.'" Id.

II.    Denial of Benefits to Plaintiff

    A.    Standard of Review to Be Applied

The parties do not dispute that the Plan, by its express terms (see Dronkers Aff., Ex. 1,

Group Insurance Certificate and Summary Plan Description ("Plan Description"), 22-23),

confers discretionary authority on the plan administrator to render decisions such as the one

challenged here.  Thus the "arbitrary and capricious" standard of review should apply.  However,

plaintiff argues that "it is evident that Northwestern [Mutual] was operating under an apparent

conflict of interest when it made its decision to deny benefits" to him, and that this Court should

therefore determine his eligibility for the claimed benefits de novo.  (P. Opp. at 10.)

---

    [2] Even under a de novo standard of review – for instance, where a plan does not confer
discretionary authority on the administrator, and the court need not defer – a court ordinarily will
review only the record that had been available to the claims administrator, absent "good cause"
to consider additional evidence.  Muller, 341 F.3d at 125.

Obtaining *de novo* review on this ground requires crossing a high threshold.  A plaintiff must "show[] . . . a conflict of interest" on the part of the administrator, in the first place. Sullivan v. LT Aerospace and Defense Co., 82 F.3d 1251, 1255 (2d Cir. 1996).  Without more, even proof of an actual conflict does not change the deferential standard of review: "th[e] conflict must be weighed as a factor in determining whether there has been an abuse of discretion . . . . [*under*] *the arbitrary and capricious standard of review*."  Id. (emphasis added); see also Pulvers, 210 F.3d at 92 ("The fact that [defendant] served as both plan administrator and plan insurer, although [an actual conflict] to be weighed in determining whether there has been an abuse of discretion, is alone insufficient as a matter of law to trigger stricter review.") (internal quotation marks and citations omitted).  Only where a plaintiff can show "evidence . . . that the administrator was *in fact* influenced by the conflict of interest" in making the challenged decision does "the deference otherwise accorded the administrator's decision drop[] away," and does "the court interpret[] the plan *de novo*."  Sullivan, 82 F.3d at 1255-56 (emphasis added).[3]

---

[3] Whether this "in fact" proof requirement poses a practically insurmountable hurdle, save in rare circumstance where a smoking gun shows "the decision-makers stating explicitly, 'In view of our conflict, we find [our] construction [of a plan term] to be reasonable,'" DeFelice v. American Int'l Life Assur. Co., 112 F.3d 61, 66 n.3 (2d Cir. 1997) – and whether the hurdle should perhaps be lowered by shifting the burden to a defendant to prove that an actual conflict did *not*, in fact, taint its decision, see Brown v. Blue Cross and Blue Shield of Alabama, Inc., 898 F.2d 1556 (11th Cir. 1990) – is not a question for this Court, which is bound to apply settled Second Circuit precedent.

Here, plaintiff fails to allege even an interest that could be considered a conflict.[4] Describing the circumstances that he claims give rise to a conflict, he states that defendant's [agent] "assured him," prior to his purchase of the group policy as co-owner of the employer restaurant, that his "recent stroke . . . . will not negatively impact any future claims for benefits should Guglielmi become disabled." (P. Opp. at 3.) He purchased the group policy, he claims, "[b]ased in large part on [the agent']s representations." (Id.) He informed defendant during appeal of the subject denial of benefits that he believed he had been misled by the agent. (Id., citing P. Ex. I.) He contends that defendant was conflicted, because "[a]ny finding that [its agent] acted inappropriately would have had a negative [impact] upon Northwestern." (P. Opp. at 10.)

However, while the relationship between defendant and its agent might have prevented defendant from being appropriately objective – and therefore could suggest a conflict of interest – in the context of an investigation by defendant of the agent's performance, there is no logical link between defendant's supposed partiality in investigating its agent's conduct and the decision challenged in this case: a finding of plaintiff's ineligibility for benefits. Even if the agent *had*

---

[4] Although plaintiff does not make the point, a conflict that has been found to exist in similar cases may appear here. The administrator in this case seemingly also funded any claimed benefits, giving rise to a possible conflict between its interest in conserving its own funds and its duty to pay the proper claims of those insured. See Pulvers, 210 F.3d at 92; see also Cook v. The New York Times Co. Long-Term Disability Plan, 02 Civ. 9154 (GEL), 2004 WL 203111, *3 (S.D.N.Y. Jan. 30, 2004) (citations omitted) (finding an actual conflict where "an administrator is in the employ of the company paying out the benefits"). Even in cases where this type of conflict was specifically identified, however, its existence alone – without proof of an actual effect on the challenged decision – did not eliminate the deferential standard of review. See Pulvers, 210 F.3d at 92; Cook, 2004 WL 203111 at *3. Guglielmi does not contend that such an actual conflict actually affected the administrator's determination of his claim. The seeming existence of an actual conflict in this case nevertheless does not secure plaintiff *de novo* review of his claim determination.

misled plaintiff about his likelihood of qualifying for benefits, such a misrepresentation could not have rendered plaintiff actually eligible. Guglielmi does not claim that the agent purported to modify the terms of the written plan itself, but only that the agent generally promised that he would have no problems obtaining coverage under that plan; indeed, plaintiff expressly (see P. Rule 56.1 Stmt. ¶¶ 2-14), and throughout his arguments relies on the terms of the written plan in arguing that defendant's determination was clearly erroneous. If plaintiff is entitled to pursue legal relief for any damages he sustained in reliance on the agent's allegedly misleading promise, such relief is not sought or available in this action challenging the plan administrator's determination of a claim based on the terms of a plan that plaintiff agrees should govern his eligibility. As plaintiff has failed to show that a conflict of interest in fact influenced the administrator's decision to deny him the benefits claimed, this Court's standard of review must remain highly deferential.

        B.      <u>Reasonableness of Administrator's Decision</u>

                1.      <u>Failure to Meet Eligibility Work Requirements</u>

Substantial evidence in the administrative record supports the administrator's finding that plaintiff did not meet the work requirements for insurability in the first place, because he was never "actively [a]t [w]ork 30 hours per week at any time . . . prior to claiming to be disabled." (D. Rep. at 3.) There is thus no genuine material issue of fact precluding the conclusion that the administrator's decision to deny plaintiff's claim on this ground was reasonable and neither arbitrary nor capricious.

The terms of insurability under the Plan are not contested. (See P. Rule 56.1 Stmt. ¶¶2-14.) Among other requirements, a successful claimant must have become eligible for insurance

in the first place by being a "Member" – one who was "[r]egularly working 30 or more hours per week for the Employer" – for at least 90 consecutive days as of, or by some date after, the Plan's employer effective date, in this case March 27, 2002.  (Dronkers Aff, Ex. 1, Plan Description, 1-2.)  A claimant who was not an eligible member as of the employer's effective date of insurance would have been subjected to a delayed effective date following attainment of eligibility, delayed insurance becoming effective "on the day after you complete one full day of Active Work."[5]  (Id. at 7.)  These terms operated to ensure that a claimant had really been working full-time – not merely been present in the workplace in some nominal or sporadic sense – before he could be deemed entitled to receive benefits under his employer's disability insurance plan.

Defendant contends that the evidence it reviewed showed plaintiff never to have met the Plan's work requirements prior to submitting his claim and thus never to have qualified for coverage at all.  The administrative record, while not unambiguous, nevertheless indicates that it was reasonable for the administrator to reach this conclusion.

a.      Notice to Claimant

Regardless of the evidence and argument presented by a benefits administrator to the *reviewing court*, a key aspect of the reasonableness of an administrator's denial is that its basis be communicated to the *claimant* at the time with sufficient clarity to "provide the [claimant] with information necessary for him or her to know what he or she must do to obtain the benefit . . . . [and to] enable the [claimant] effectively to protest that decision."  Juliano v. Health

---

[5] The Plan defined "Actively At Work" and "Active Work" to "mean[] you are performing the Material Duties of your Own Occupation at your Employer's usual place(s) of business."  (Id.)  The Plan in turn defined "Material Duties" as "the essential tasks, functions and operations and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation."  (Id. at 11.)

Maintenance Org. of New Jersey, Inc., 221 F.3d 279, 287 (2d Cir. 2000) (explaining the purpose of the statutory notice requirement for ERISA plans, at 29 U.S.C. § 1133).  "[S]ubstantial[] compl[iance]" with the federal regulations requiring administrators to furnish specific reasons for denials, reference relevant plan provisions, and describe any additional information a claimant might supply to perfect his claim, may suffice to meet the statutory mandate of full and fair review, even when an individual communication from the administrator does not strictly meet those requirements.  Burke v. Kodak Retirement Income Plan, 336 F.3d 103, 107 (2d Cir. 2003); see also Cook, 2004 WL 203111, at *6 (describing other circuits' agreement with the "substantial compliance" standard).  Substantial compliance means that the beneficiary was "supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review." Haplin v. W.W. Grainger, Inc., 962 F.2d 685, 690 (7th Cir. 1992).

Although plaintiff does not raise the issue, because adequate notice, to enable effective protest, is a crucial element of the ERISA framework, see Juliano, 221 F.3d at 287, especially in light of the mandate of judicial deference to administrators in many cases, the Court has considered whether defendant substantially complied with its duty to provide adequate notice of the relevant basis for denying plaintiff's claim.

Defendant's denial notices in this case are less than a model of clarity.  Yet under the circumstances and as a whole, they sufficiently apprised plaintiff of the reasons for denial of his claim – specifically considered here, the reason that he had failed to meet the Plan's eligibility work requirements – to afford him an understanding of the administrator's position and notice as

to what would be required to cure the defect, if possible, in his claim.  Thus, they substantially complied with the ERISA notice requirement.

As plaintiff points out, defendant at first expressed a position contrary to its final one on plaintiff's underlying eligibility for coverage.  In its initial denial letter of October 2, 2003, defendant stated that, "[b]ased on the information contained in your claim file, as well as the above policy provisions, it appears that you became a Member on March 27, 2002 (the date the policy first became effective)."  (P. Opp. at 4; see also P. Ex. A.)  Plaintiff does not argue that an administrator's allusion to membership in a denial letter can override the Plan terms of membership.  The statement in the initial denial letter, however, certainly bears on whether defendant sufficiently notified plaintiff of a basis for denial.  A letter notifying a claimant that he appeared to be a "Member" cannot be taken as due notice that his claim would be denied because he was not a member.  Thus, the first denial letter does not meet defendant's duty to supply plaintiff with sufficient notice of his failure to meet a work requirement for eligibility.

Defendant first cited plaintiff's failure to meet the work requirement in its second denial of the claim, on October 24, 2003.  Its letter stated, "[Y]ou never met the Actively At work requirement, and thus, you were never an insured Member."  (P. Ex. B.)  That phrasing is unequivocal.  The letter also referred to a piece of evidence, plaintiff's claim form under his individual insurance policy documenting his declining level of work over time (see P. Ex. G), that the administrator had considered.  The letter's additional reference to the Plan's preexisting condition exclusion may have complicated the message of plaintiff's failure-to-work ineligibility, but the message nevertheless was sufficiently clear.  Plaintiff does not contend that he did not know of or understand the denial letter's reference to the work requirement.

14

After this second denial letter, plaintiff's then-lawyer obtained the entire record-to-date regarding plaintiff's claim.  In cases where the record is sizeable or the basis of denial of a highly technical nature, merely furnishing the record upon which a denial was made might not be considered to be a form of due notice.  Under these circumstances, however, the record was relatively sparse, and much of it quite obviously had to do with the extent that plaintiff had been working.  Thus, the administrator's readily supplying its entire decisional record to plaintiff's attorney in this case further substantially complied with its duty to notify a claimant of the evidence it considered, sufficient for the claimant to be able to challenge the denial.

Finally, defendant's third denial letter explicitly repeated that the claim was being denied because plaintiff "was never an insured member."  (P. Ex. J.)  The letter cited evidence, in the form of a telephone call between a staff member of defendant and plaintiff in which plaintiff "informed [defendant] that he never returned to work for more than 30 hours per week," even after the date he claimed to have resumed work following his stroke.  (Id.)  The letter concluded that plaintiff had been "working less than the required amount of hours to be considered a Member."  (Id.)  This letter clearly provided sufficient notice.

b.    Basis in the Administrative Record

To allow plaintiff's claim, the administrator would have to have determined, among other elements, that plaintiff had become an eligible member by regularly working 30 or more hours per week for at least 90 consecutive days as of, or by some date after, the employer effective date of the Plan, March 27, 2002.  (See Dronkers Aff., Ex. 1, Plan Description, 1-2.)  The administrative record contains substantial evidence supporting defendant's conclusion that plaintiff failed to meet this requirement.  While there is some evidence that could be construed as

15

supporting plaintiff's position that in July 2002 he had begun working 30 or more hours per

week and continued to do so for some period, an administrator's decision under the deferential

standard of review may be upheld even when "there is evidence in the record . . . that would

have supported a contrary finding." Pulvers, 210 F.3d at 94.  In any event, the Court does not

deem the evidence favoring plaintiff so persuasive as to conclude that the determination should

have been otherwise, even without the lens of deference.

The evidence on which the administrator explicitly relied, according to the denial notices,

included Guglielmi's telephone conversation with a member of defendant's staff, in which he

said he had not worked for more than 30 hours per week since his stroke.  This telephone call

was memorialized in a contemporaneous, internal Northwestern Mutual email describing the

conversation.  (Dronkers Aff., Ex. 2, Administrative Record, STND894-00123.)  Plaintiff does

not offer sworn testimony denying the occurrence or substance of this conversation, merely

referring to it as "an alleged telephone call" and contending that its uncontested substance "is

inconsistent with the written documentation provided by Guglielmi and the employer where it

indicates that Guglielmi worked more than 30 hours per week from July 2002 until the time he

became disabled."  (P. Opp. at 7.)  Without any citation to specific written documentation, the

Court is left to assume plaintiff's contention references the documents discussed below.

Regardless of the existence of conflicting information, the administrator was entitled to credit the

memorandum purporting to reflect plaintiff's own admissions.

The administrator also explicitly cited, in its second denial letter, evidence consisting of a

form plaintiff had submitted in connection with a claim under his individual insurance policy,

claiming to have become disabled after he "suffered 3 strokes in 5 days" beginning on December

16

29, 2001, which had caused him "loss of right side body mobility; loss of partial sight in rt eye & hearing rt []ear w/ pain."  (See P. Ex. G.)  Guglielmi described the required activities of his work to include "standing for long hrs, greeting & speaking w/ customers, carrying large trays of food, opening wine bottles & pouring wine, [serving] wine & beverages, employee mngt[]."  (Id.)  He checked off a box indicating that he had "performed some job duties and/or worked only part time" from July 1, 2002 – the date he now claims to have returned to work after his stroke (see P. Ex. H) – through the date of the form, which was received by defendant on October 2, 2003.  (Id.)  He filled in a related chart, stating that he had continued to perform "all duties assigned" in the second half of 2002, spending "70% of time at" those duties, for "40+" hours per week; in the first half of 2003 spending "50% of time at" those duties, for "40+" hours per week; and from July 1, 2003, spending "30% of time at" those duties, for 40 hours per week.  (Id.)

This information is somewhat cryptic, as there is no obvious referent for the stated percentages.  But elsewhere on the form, plaintiff had reported working an average of "8-10+" hours per day, five days per week, prior to becoming disabled.  Defendant apparently interpreted the post-disability percentages as describing plaintiff's "work ability" relative to his ability prior to his stroke – a reasonable interpretation, in the context of plaintiff's other statements on the form.  (P. Ex. B.)  On this interpretation, by spending "70% of time at" his duties, plaintiff would have been working at most 28 to 35 hours weekly in the second half of 2002, compared to his estimated 40 to 50 weekly hours pre-disability.  That calculation, in addition to plaintiff's notations of working "40+" or "40" hours per week during his period of decline, leaves room for concluding from this document that plaintiff did work 30 or more hours per week at least for a certain period after July 2002.  However, in light of plaintiff's description of the onset and nature

17

of his disability and of the demands of his work, on the same form, it was not arbitrary or capricious for the administrator to conclude that plaintiff could not actually have worked 30 or more hours per week on a sufficiently sustained basis to become eligible for coverage.

The reasonableness of that conclusion, moreover, is supported by considerable other evidence in the record, including the September 9, 2003, "Employee Statement" that plaintiff signed and submitted in support of his claim, describing his work (P. Ex. C); the simultaneous "Employer Statement" describing the extent and nature of the physical demands of plaintiff's job (P. Ex. D); and the "Attending Physician Statement" also relating to the claim that addressed plaintiff's ability to meet his job's physical demands as described by the employer (Dronkers Aff., Ex. 2, Administrative Record, at STND894-00114-15).

The physician statement reported that Guglielmi had suffered a stroke in December 2001, and that his physician, Dr. Harry Weinbauch, had recommended that he "stop work" at that time. (Dronkers Aff., Ex. 2, Administrative Record, at STND894-00114-15.)  Weinbauch described plaintiff as "profoundly affected by the stroke in December 2001," reporting that plaintiff could in a given work day lift or carry at most "1-10" pounds, sit, stand, or walk for "0" hours, "occasionally" bend or stoop, but not twist or squat at all, and only "with difficulty" kneel, lift, or carry.  (Id.)  Plaintiff could not grasp, push, pull, perform "finger manipulation," or type with his "major hand," according to the doctor.  (Id.)  Although the physician statement refers to ongoing medical visits "every 3 month[s]" through September 9, 2003, it nowhere suggests that the patient's impairments began at any point subsequent to his December 2001 stroke.  To the contrary, the doctor, in response to the form question, "When did symptoms appear or injury happen?" answered, "Stroke Dec. 2001."  (Id.)  Further, among the options for indicating

18

whether "[s]ince the onset of symptoms, the patient's condition has" improved, Dr. Weinbauch checked, "Not changed." (Id.) A reasonable administrator would be entitled to infer that Guglielmi was totally disabled from performing meaningful work during the period he now claims to have been actively employed full-time.

The September 2003 "Employer Statement" submitted in support of the disputed claim described a set of work demands that closely mirrored the very functions that Dr. Weinbauch had found plaintiff largely unable to perform apparently since December 2001. In a given work day, the statement reported, plaintiff "would" lift or carry 21-50 pounds, sit for a total of three hours, stand or walk for four consecutive hours at a time, repeatedly use his hands, frequently bend, stoop, squat, and carry, and occasionally twist, kneel, and lift.[6] (P. Ex. D.)

This list of job demands accords with plaintiff's own description of his work, on his September 2003 "Employee Statement," as serving as "wine sommelier[,] waiter, [and] restaurant manager." (P. Ex. C.) In that statement, plaintiff described his "illness" as "not able to hold items[,] difficulty walking/standing[,] loss of short-term memory[,] cannot drive," stating that he "cannot function as manager or waiter of the restaurant." (Id.) He reported that he had first consulted a physician for his illness on January 2, 2002, and had been hospitalized at that point. His reported dates of treatment and impairments coincided with the other details in the record regarding his stroke. Neither the employer nor plaintiff furnished any description of the job that suggested it could be performed full-time without engaging the abilities that plaintiff was documented by his physician to have lost significantly due to that stroke. Indeed, the

---

[6] The phrasing of the form question, while not perfectly precise, fairly obviously references a claimant's *pre*-disability activities.

19

employer stated that the described position could not "be modified to accommodate limitations."
(P. Ex. D.)  These documents well demonstrate the reasonableness of the administrator's
conclusion that plaintiff could not have worked his job for 30 or more hours per week for any
period subsequent to his debilitating December 2001 stroke, and that he was therefore ineligible
for coverage when he submitted his claim for benefits in September 2003.

The purportedly contrary evidence that plaintiff indicates does not diminish the
substantial evidence supporting the administrator's decision and therefore rendering it
reasonable.  Guglielmi points out that, on his September 2003 "Employee Statement," he had
reported his "dates of employment" as "6-30-00 to present."  (P. Ex. C.)  "Hence," he argues, "as
of the date of the form, . . . [I] was still working."  (P. Opp. at 4.)  However, it was reasonable for
the administrator not to consider this representation over other, contradictory evidence; indeed,
plaintiff on the same form wrote that he had been hospitalized or in rehabilitation from January 2
to February 2, 2002, undermining his argument that his reported dates of employment should be
taken to mark the time period that he actually worked.[7]

It was similarly reasonable for the administrator not to be persuaded by the
representation, on the September 2003 "Employer Statement" submitted on Guglielmi's behalf,
that plaintiff had returned to work as a "waiter/restaurant manager" for "40+" hours per week on

_____

[7] Plaintiff complains that defendant "never asked for clarification" of contradictions in
the record.  (P. Opp. at 5.)  However, he cites no authority for the implicit proposition that a
claims administrator must affirmatively seek clarification from claimant of ambiguities in the
record before reaching a conclusion about the claim.  The standard on this motion requires only
that the administrative record contain *substantial*, not absolutely consistent, evidence, supporting
the administrator's decision.  See Pulvers, 210 F.3d at 94.  Plaintiff does not contend that he was
denied the opportunity, during internal appeals of the denial, to correct or supplement the
evidence before the administrator.  Indeed, the record shows plaintiff to have had more than one
such opportunity.

July 1, 2002. (P. Ex. D.)  As discussed, the job duties described in that form closely matched the

activities that plaintiff's physician had in December 2001 found him significantly unable to

perform following his stroke.  In the context of the other evidence, on the form and in the rest of

the record, it was not erroneous for the administrator to conclude that plaintiff had not been

working his stated job for any significant period following his stroke, despite the employer's

notation that he had returned to work full-time in July 2002.

Finally, plaintiff points to his letter of October 20, 2003, to the claims administrator,

stating that "I did return to work in July of 2002 but have been experiencing a gradual decline

beginning in July of 2003." (P. Ex. H.)  He argues that this letter is evidence that, "[f]rom July

1, 2002 until July 2003, Guglielmi was continuously active at work [and] . . . . [t]hus . . . was

continuously insured under the Plan." (P. Opp. at 5, 12.)  However, besides the vague statement

that he had been "active at work," the letter offers no detail at all about the hours he actually

worked or the duties he performed, during that time.  Moreover, plaintiff's individual-policy

claim form had described his time at his work duties as "50%" in the first half of 2003.  (P. Ex.

G.)  Interpreting the "50%" to refer to his pre-stroke level of work, as the administrator

reasonably did, it was sound to conclude that plaintiff could not have been working 30 or more

hours per week from July 2002 until July 2003, even if plaintiff's letter suggested otherwise.

The reasonableness of this conclusion is bolstered by the other evidence, as already discussed, of

the starting point and extent of plaintiff's stroke-related impairments.

### 2.  Preexisting Condition Exclusion

Defendant also denied plaintiff's claim on the basis of the Plan's preexisting condition

exclusion.  (See P. Exs. A, B, J.)  Plaintiff's argument against the reasonableness of a denial on

this alternative basis entirely fails to persuade.  As plaintiff recites, the Plan provided that:

> You are not covered for a Disability caused or contributed to by a
> Preexisting Condition or medical or surgical treatment of a
> Preexisting Condition unless, on the date you became Disabled:
> * You have been continuously insured under the Policy for the
> entire Exclusion Period shown in the specifications; and
> * You have been Actively At Work for at least one full day after
> the end of the Exclusion Period.

(Dronkers Aff., Ex. 1, Plan Description, 16-17.)   Plaintiff does not dispute that the claimed

disability was a preexisting condition.  The Plan defined a preexisting condition to be "a mental

or physical condition for which you have consulted a Physician or Practitioner, received medical

treatment or services, or taken prescribed drugs or medications at any time during the Preexisting

Condition Period shown in the Specifications."  (Dronkers Aff., Ex. 1, Plan Description, 17.)  As

relevant, the "Preexisting Condition Period" was defined to be "[t]he 180-day period just before:

The date your insurance becomes effective."  (Id. at 4.)  Dr. Weinbauch's "Attending Physician

Statement" noted that he had been treating plaintiff for his stroke-related problems "every

3month[s]" from February 29, 2001, through at least September 9, 2003 (Dronkers Aff., Ex. 2,

Administrative Record, STND894-00115) – a frequency that would have brought plaintiff's

claimed disability within the "Preexisting Condition Period" as measured as any 180-day period

after his stroke and up to the date he submitted his claim form.

Rather, plaintiff contends that,"[f]rom July 1, 2002[,] until [at least] July 2003, Guglielmi

was continuously active at work as he worked in excess of 40 hours per week during that time

frame," and thus he was"continuously insured under the Plan for the entire 12 month Exclusion

Period" as required to escape denial of his claim under the preexisting condition exclusion.  (P.

Opp. at 5.)  However, even assuming plaintiff had returned to work, as he claims, on July 1,

2002 – and assuming he had somehow continued to work 30 or more hours per week even as late as the date he submitted his claim form, in September 2003 – defendant would not have been "continuously insured . . . for the entire Exclusion Period." The Plan defined the "Exclusion Period" to be "[t]he first 12 months you are insured." (Id. at 4.) Given the 90-day eligibility waiting period to be considered insured (id. at 2), plaintiff, assuming his purported return-to-work date of July 1, 2002, would not have become "insured" until October 2002. His 12-month "Exclusion Period" would therefore have lasted until October 2003; however, he submitted his form claiming disability to work in September 2003, one month before the close of this period. Thus, even assuming the most favorable-to-plaintiff work and disability dates conceivable on the administrative record, it was entirely reasonable for the defendant to reject the claim on the basis of the preexisting condition exclusion.

As there is no genuine issue that the disputed claim denial was reasonable and supported by substantial evidence in the administrative record, and because plaintiff has presented no persuasive reason to consider any other standard or evidence, defendant is entitled to summary judgment that it did not wrongly deny plaintiff the claimed disability benefits.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.

SO ORDERED.

Dated: New York, New York
July 6, 2007

_____
GERARD E. LYNCH
United States District Judge

23